# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| KENNETH HENRIKSON, | No. 60334-9-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| KING COUNTY, WASHINGTON; KING COUNTY DEPARTMENT OF PUBLIC DEFENSE, TDA DIVISION; BEN GOLDSMITH, MANAGING DIRECTOR; JACKLYN ZORICH, MANAGING DIRECTOR OF TDA; ANITA KHANDELWAL, DIRECTOR OF DPD, | |
| Appellant. | |

CHE, J. — Kenneth Henrikson appeals following summary judgment dismissal of his claims for wrongful termination in violation of public policy, invasion of privacy pursuant to chapter 9.73 RCW, and negligence claims, denial of CR 60 motions, and an award to one defendant for damages under the anti-SLAPP statute.[1]

Henrikson sued his former employer, King County (County), and three county employees (collectively, defendants) with managerial responsibilities related to Henrikson's former employment. Henrikson's former employment as a public defender was terminated after he

---

[1] Washington Act Limiting Strategic Lawsuits Against Public Participation, RCW 4.24.510.

refused management's orders to stop working on a civil case Henrikson was not assigned to by the County but believed would have an impact on a case he was assigned. Henrikson continued to work on the civil case despite leadership's directives because Henrikson believed he had an ethical and legal duty to assist his client. When Henrikson was placed on paid administrative leave, one of the individual defendants with managerial responsibilities over Henrikson monitored Henrikson's work e-mail, including e-mails allegedly containing private communications through voicemails from the client to Henrikson.

The defendants successfully sought dismissal of all Henrikson's claims, including a defamation claim, a wrongful termination in violation of public policy claim, an invasion of privacy claim, and a negligence claim. The defamation claim against one of the county employees was dismissed following a motion to dismiss. All other claims were dismissed through summary judgment proceedings. Henrikson moved for reconsideration or vacation of the summary judgment orders under CR 60, but the trial court denied his motions. The trial court awarded the employee defendant named in Henrikson's defamation claim $10,000 in anti-SLAPP damages.

Henrikson argues that summary judgment was inappropriate for his wrongful termination claim, his invasion of privacy claim, and his negligence claim. He also claims that the trial court erred in denying his CR 60 motions and awarding the one defendant anti-SLAPP damages.

We hold that (1) Henrikson fails to establish a genuine issue of material fact necessary to his wrongful termination claim and invasion of privacy claim, (2) Henrikson's challenge to the dismissal of his negligence claim fails because he raises a different negligence claim for the first time on appeal, and (3) Henrikson fails to show that the trial court abused its discretion in denying

his CR 60 motions. We decline to consider Henrikson's anti-SLAPP damages award arguments raised for the first time on appeal.

Accordingly, we affirm.

## FACTS

### I. SUBSTANTIVE FACTS

Henrikson was a staff attorney in The Defender Association Division (TDAD), a division of the County's Department of Public Defense (DPD). DPD was comprised of four divisions of public defenders, one being TDAD, and a central administrative entity, the Director's Office (DO). The four divisions operated as separate and independent law firms so that representation of clients by one division would not cause conflicts in another.

An "Ethical Walls Policy" for DPD provided that the DO's responsibilities included advocating for funding and assigning caseloads to the divisions, but the DO could not have access to confidential client information gained through representation nor interfere with ongoing representation of any division's client. Clerk's Papers (CP) at 353. To ensure separation of the divisions and separation of the DO from any division, the Ethical Walls Policy separated each group's resources, access and storage of databases and files, and supervision of personnel procedures. The Ethical Walls Policy provided that each division was responsible for "[p]rotect[ing] the confidentiality of all information gained in the course of client representation consistent with [Rules of Professional Conduct (RPC)] 1.6 (Comment 2)."[2] CP at 566. It also stated that: "As concerns client representation assigned to that division, the managing attorney is

---

[2] This comment sets out the "fundamental principle in the client-lawyer relationship . . . that, in the absence of the client's informed consent, the lawyer must not reveal information relating to the representation." RPC 1.6, cmt. 2.

solely responsible for providing guidance to staff and for determining litigation strategy." CP at 566.

In 2017, Henrikson was assigned to TDAD's Sexual Offender Commitment (SOC) unit. Through a contract, Washington's Office of Public Defense (OPD) assigned the unit to represent a client (Client) in a civil commitment proceeding (sexually violent predator (SVP) proceeding). Henrikson and his immediate supervisor were assigned to the Client's SVP proceeding.

According to Henkrison, at issue in the SVP proceeding was whether there was dispositive proof of a predicate offense[3] because Client had made an *Alford*[4] plea to the prior offense as opposed to a traditional plea. At some point, Jackie Zorich (then supervisor of the SOC unit) became aware that, in addition to facing the SVP proceeding, the Client was being sued for a civil battery claim by the victim of the potential predicate offense for the SVP proceeding (Civil Case) and notified Henrikson about the Civil Case.

Henrikson believed that, depending on the outcome of the Civil Case, the Civil Case could provide proof for or against there being a predicate offense in the SVP proceeding or assist in arguing against other issues in the SVP proceeding. Henrikson also believed that discovery available in the Civil Case but not available through the SVP proceeding could help obtain a dismissal of both proceedings for the Client.

---

[3] The central issue of the Client's SVP proceeding was whether the State could prove beyond a reasonable doubt that the Client was a "sexually violent predator." *See* RCW 71.09.060. To prove such, the State had to show that the Client was a "person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(19).

[4] *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

Henrikson began to assist the Client in the Civil Case, including advising the Client and helping the Client, who was proceeding pro se, draft an answer to the complaint. According to Henrikson, he discussed the Civil Case with Zorich, Henrikson's immediate supervisor, and Ben Goldsmith—the then acting Managing Director of TDAD. Eventually, Goldsmith suggested that Henrikson approach a "Collateral Consequences" attorney with TDAD[5] to assist the Client with the Civil Case.

The Collateral Consequences attorney entered a limited appearance on behalf of TDAD in the Civil Case. The notice of limited appearance specifically stated that the attorney's appearance was limited to receiving discovery in the Civil Case. The Client remained pro se for all other matters in the Civil Case.

In June 2018, the plaintiff in the Civil Case moved to dismiss the Client from the case. According to Henrikson, he consulted with Zorich, the Collateral Consequences attorney, and Henrikson's immediate supervisor to decide how to proceed. Henrikson drafted an answer and a counterclaim for defamation for the Client in the Civil Case, which were filed and sent to the Civil Case plaintiff by TDAD paralegals.

The next day, the plaintiff's attorney in the Civil Case reached out to Anita Khandelwal—then Deputy Director of DPD—seeking clarification on TDAD's scope of representation in the Civil Case. Khandelwal reached out to Rick Lichtenstadter—then Managing Director of TDAD—and the Collateral Consequences attorney asking to understand what was happening with the Civil Case. Khandelwal responded to the plaintiff's attorney and told them that DPD did not represent

---

[5] Both parties dispute the scope of Collateral Consequences attorney's work but agree that they are attorneys funded by the City of Seattle to assist TDAD clients with at least some civil cases.

the Client in the counterclaim, the Collateral Consequences attorney's appearance in the case was limited to receiving documents for service on the Client, and the Collateral Consequences attorney had withdrawn from the case.

A day after Khandelwal's response to the plaintiff's attorney, TDAD filed an objection to the Civil Case plaintiff's motion to dismiss. The plaintiff's attorney again reached out to Khandelwal, Henrikson, and the Collateral Consequences attorney requesting clarification of TDAD's involvement in the Civil Case considering the recent filing. Henrikson admitted to ghost writing some of the Client's filings in the Civil Case and told the plaintiff's attorney that he was "the drafter for the client" but was working to find the Client "a more permanent attorney" and was not formally representing the Client in the Civil Case. CP at 780.

Lichtenstadter e-mailed Henrikson stating: "Please do not do any more work on this case except for finding an attorney to take it on or to at least accept production." CP at 1479. When Henrikson responded asking whether this applied to his work on the Client's SVP proceeding, Lichtenstadter clarified that the direction was limited only to the Civil Case.

Henrikson reached out to an attorney outside of TDAD and asked the attorney whether they could take the Client's Civil Case. In pitching the Client's Civil Case to the attorney, Henrikson told the attorney "I will keep his SVP case, b[u]t I need you to take a caretaker role on his civil case. You would only need to maybe do a very limited notice of appearance to get civil [discovery], and that can be temporary. I can do the work behind the scene, as I have been doing, but TDA[D] management told me to stop helping him." CP at 2028. The attorney filed a notice of appearance in the Civil Case. For the next couple months, Henrikson worked with the attorney in drafting filings for the Civil Case.

In spring 2019, it appears that Client's attorney in the Civil Case was contemplating withdrawing. Henrikson offered to "ghost write and assist [the attorney] as an unlimited resource." CP at 2041. Henrikson continued to draft materials for the Civil Case.

When the plaintiff's attorney told the Client's attorney in the Civil Case that they intended to raise an anti-SLAPP defense to the Client's defamation counterclaim and would seek attorney fees and damages under the anti-SLAPP statute if the defense was successful, the Client's attorney notified Henrikson. Although the Client's attorney told Henrikson they had advised the Client about the potential defense, Henrikson consulted with the Client, at the Client's request, and advised the Client, among other things, that Henrikson was "not sure enough [the Client's attorney was] right to make an irrevocable decision." CP at 2055. Henrikson told the Client he would "pay all attorney fees of [the Client] and [their] opponents" and advised the Client that, if the attorney withdrew, the attorney should seek a continuance or delay to find the Client another attorney. CP at 2055.

Henrikson reached out to his immediate supervisor and other TDAD attorneys to research the anti-SLAPP statute. CP at 981-82. Henrikson told them that the Client's attorney in the Civil Case was planning on withdrawing and that he was "scrambling to get a substitute attorney." CP at 981. Henrikson's immediate supervisor told Henrikson and the other attorneys:

> I thought it would be helpful to clarify our role re the civil case:
> - we don't represent [the Client] in the civil case
> - we don't file anything
> - we don't sign anything
> - we don't advise the client about the civil case, except to explain what may happen to [the SVP proceeding] as a result of certain decisions
> - we CAN consult with his civil attorney, just as we would with any other attorney who also represents our clients on collateral matters. This can include some research and giving our opinion to the civil attorney in areas where the interests overlap if not overly time consuming or outside our role.

[Client] has different interests and goals related to his civil case which may or may not conflict with his goals and interests in the SVP case, so we can work with his civil attorney and consult with his civil attorney, but cannot represent or advise him on his civil case.

CP at 978. Henrikson responded:

Unfortunately, there is more to this case than what citing management edicts which are great in a vacuum in defining role parameters. People need to think for themselves. There was additional thinking to do. I cannot express these things in the time allotted me, so I have to comply with the RPC's. I can't agree that life is that simple. Thought is required. There are nuances. Life is not one big checklist. Sorry. All I can do is what the RPC's compel me to do not mindless boundary recitations with no thought having been put into them. The stage of this case and the needs are too complex for management to understand unless it's explained to them. They won't listen to me so I just do what I must, since they can't take any kind of reality into account.

CP at 978.

Henrikson continued to assist the Client with the Civil Case. Henrikson attended a deposition preparation session for the Client, met with other attorneys to find additional or substitute counsel for the Client, personally retained attorneys to perform legal research and work for the Client, and provided the Client's Civil Case attorney with evidence to defend against a motion for summary judgment on the Client's defamation counterclaim. According to Henrikson, his immediate supervisor attended at least the deposition preparation and a meeting to recruit counsel.

According to Henrikson, he attempted to get the Client's Civil Case attorney to disclose a conflict of interest because Henrikson believed that the attorney had committed malpractice by neglecting to conduct discovery or pursue the defamation counterclaim. The Civil Case attorney moved to continue trial and moved to withdraw. Around the same time, the Civil Case plaintiff moved for summary judgment on the Client's defamation counterclaim.

In support of the Client's motion to continue and the Client's counsel's motion to withdraw, Henrikson drafted a declaration, which was subsequently filed in the Civil Case, to bring to the court's attention allegations that the Client's attorney had violated the RPCs and omitted facts relevant to the motion to continue. After the trial court in the Civil Case denied a motion to continue from the Client, Henrikson worked on a response for the Client to the motion for summary judgment. Henrikson told the Client's Civil Case attorney that because of the attorney's "malpractice," "it is my job to mitigate the damages to this client." CP at 2067. Henrikson said, "Because I am committing insubordination by helping out, I could be fired or resign at any time, but hopefully I can get as much as I can done by [the motion's hearing date]." CP at 2067.

On June 7, the supervisor for the County's unit prosecuting the Client's SVP proceeding e-mailed Zorich and Henrikson's immediate supervisor and informed them that the unit planned to file a motion to disqualify TDAD from representing the Client in the SVP proceeding due to Henrikson's involvement in the Civil Case, including his recent declaration. The trial court in the Civil Case granted the plaintiff's motion for summary judgment and dismissed the Client's defamation counterclaim pursuant to the anti-SLAPP statute.

On June 25, an attorney for the plaintiff in the Civil Case reached out to Khandelwal expressing concerns about Henrikson's continued involvement in the Civil Case and stated that his next steps had "the potential of creating repercussions for TDA[D] and possibly DPD in both the civil matter and the civil commitment proceeding." CP at 2122. Zorich notified Henrikson that, effective immediately, he was not to contact the Client. She told Henrikson that he was being investigated for suspected insubordination "related to your failure to comply with DPD's directive

to cease any involvement with the [Client's Civil Case]." CP at 1569. Zorich directed Henrikson to stop all work on any Client matter and stated that failing to comply with the directive would result in further discipline, up to and including termination. According to Zorich, Henrikson refused to comply and told her he intended to speak to the Client the next day.

Over the next few days, Henrikson continued to assist with the Civil Case, including drafting motions for reconsideration.

On July 1, Zorich placed Henrikson on paid administrative leave. Zorich directed Henrikson to comply with the following while on administrative leave:

> 2. You will not engage in any work related to [the Client]. This includes, but is not limited to, offering him legal advice or otherwise discussing any legal matters with him, whether by his initiation or otherwise. You will not have contact with any counsel representing him or consult any counsel regarding any pending or potential issues arising from [the Client's] matters.
> 3. You will not have contact with any person regarding [the Client] without prior authorization. If [the Client] or any other individuals contact[s] you or attempt[s] to contact you regarding [the Client's] matters, you will notify your supervisor within one business hour of becoming aware of such contact.

CP at 1572. Despite these directives, Henrikson continued to work on the Civil Case, including filing a notice of appeal on behalf of the Client and visiting the Client. The Client was still represented by counsel in the Civil Case at this time.

Zorich directed Goldsmith to investigate whether Henrikson had been insubordinate in his involvement with the Civil Case. Goldsmith submitted written findings after investigating Henrikson's actions. He found "overwhelming evidence that [] Henrikson committed insubordination by continuing to work on the [Civil Case] after TDAD leadership told him not to do so, in both June 2018 and July 2019." CP at 1484-85.

In December 2019, after a *Loudermill*[6] hearing, Henrikson's employment was terminated "based on [Henrikson's] repeated insubordination and failure to follow directives in regards to [the Civil Case], and related matters." CP at 1575.

## II. Procedural Facts

Henrikson sued the County, Goldsmith, Zorich, and Khandelwal. He asserted claims of wrongful discharge in violation of public policy, defamation, fraudulent and negligent misrepresentation, tortious interference with contract, invasion of privacy under chapter 9.73 RCW, breach of contract, and negligence.

A.    *CR 12(b)(6) Dismissal of Defamation Claim Against Goldsmith and Others*

The defendants moved to dismiss some of Henrikson's claims, including a defamation claim against Goldsmith. Goldsmith initially raised two arguments for why Henrikson's defamation claim should be dismissed. Goldsmith argued that Henrikson failed to state a defamation claim against him because Henrikson made no allegations specific to Goldsmith in his complaint. Second, Goldsmith argued that Henrikson failed to comply with statutory requirements that a person asserting a defamation action first "'timely and adequate[ly] request for correction or clarification from the defendant.'" CP at 391 (quoting RCW 7.96.040).

In response, Henrikson argued that he had complied with the statutory requirements in pursuing the defamation action. When Henrikson also clarified that his allegations were tied to certain statements Goldsmith made while investigating Henrikson, in a reply brief Goldsmith raised an additional argument that he was immune for any such statements under the anti-SLAPP statute, RCW 4.24.510.

---

[6] *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).

At a hearing on the motion, Goldsmith maintained his argument that he was immune from Henrikson's defamation claim under the anti-SLAPP statute. Unrelated to the defamation claim or Goldsmith, defendants had argued in this same motion that Khandelwal had statutory immunity from Henrikson's claims as "an 'appointed or elected official or member of the governing body of a public agency'" who made discretionary decisions in her official capacity. CP at 396 (quoting RCW 4.24.470).

The only argument Henrikson made in the hearing related to his defamation claim appears to have been in response to the defendants' argument of Khandelwal's immunity:

> THE COURT: So the defense argues they have immunity. Can you address that.
> [HENRIKSON]: Let me just—I think—that's what I was referring to when I—the—you're talking about the defamation claims, that the defamation immunity ties in?
> THE COURT: Yes.
> [HENRIKSON]: That applies to public figures, Your Honor. Those cases are about public figures. They're not about a—an employee, a low-level employee of the agency like Mr. Henrikson who is not a public figure.

Rep. of Proc. (RP) (May 26, 2023) at 24.

The trial court dismissed Henrikson's defamation claim against Goldsmith.[7] In its oral ruling, the court stated:

> The defense argues that there is a—the complaint sets forth a defamation claim against all defendants but is devoid of allegations against Mr. Goldsmith individually.
> That the plaintiff has only—has failed to state a claim under Civil Rule 12(b)(6), but also failed to comply with RCW 7.96.040, which provides that a person may not maintain an action for defamation without first making a timely and adequate request for correction or clarification from a defendant.

---

[7] The court also dismissed a wrongful termination claim against Zorich, Goldsmith, and Khandelwal, a tortious interference claim against all defendants, and a breach of contract claim against Zorich, Goldsmith, and Khandelwal.

The—on this issue, the plaintiff argues that Mr. Goldsmith made a finding that Plaintiff was insubordinate and recommended that Zorich terminate Plaintiff's employment; that Mr. Goldsmith based his conclusion, in fact, in part on his finding that Plaintiff's assertion that his supervisors approved of and assisted with Plaintiff's action was not credible.

The defense also argues that in such situations public officials—public figures have immunity. So the Court is going to grant the defense motion to dismiss the claim against Mr. Goldsmith.

RP (May 26, 2023) at 33.

B.     *Summary Judgment Dismissal of Wrongful Termination Claim*

In March 2024, the County moved to dismiss Henrikson's wrongful termination claim. The County argued that Henrikson failed to establish any clear public policy served by his conduct and that undisputed evidence showed the County had legitimate, non-pretextual reasons for terminating Henrikson's employment.  Henrikson argued that his claim was supported by multiple public policies: the Sixth Amendment right to counsel, multiple RPCs, and constitutional and statutory rights providing access to the courts.[8]  Henrikson argued that his assistance with the Client's Civil Case served these public policies because the Civil Case created a direct risk to the SVP proceeding and management's orders to stop assisting the Client violated some of these public policies.

On April 12, the trial court held a hearing on the County's motion.  The trial court found that there was no clear mandate of public policy served by Henrikson's actions.  The court stated:

In element one, I was looking at, is there a clear mandate of public policy that is served by Mr. Henrikson's actions here. Long story short, I could not find one. Even if you assume that things like the Sixth Amendment right to counsel or a First Amendment right to counsel or any of the other enumerated quote, unquote, public

---

[8] Henrikson also raised a public policy for reporting improper misappropriation of funds; however, Henrikson does not argue or raise this basis for his claim on appeal.  Accordingly, we do not address it.

> policies that were identified are a clear mandate, I cannot make a connection between what Mr. Henrikson did and those policies. And so just on that basis alone, I have to grant the motion and dismiss the wrongful termination claim.

RP (Apr. 12, 2024) at 29.

On April 24, Henrikson moved to continue the trial date for approximately six months and to continue all dispositive motions until after a later discovery deadline. In his motion, Henrikson noted "[a] massive amount of [produced] discovery," outstanding depositions and discovery, certain personal responsibilities for Henrikson, and Henrikson's counsel having an upcoming multi-week trial as reasons underling the request. CP at 1075. Henrikson stated that defendants had already noted another summary judgment motion for Henrikson's remaining claims which was set to be heard in June. The trial court granted Henrikson's motion to continue and set the discovery deadline to November 25, the deadline to hear dispositive motions to December 20, and trial to February 10, 2025.

C.     *Summary Judgment Dismissals of Defamation Claim Against the County, Zorich, and Khandelwal and All Other Remaining Claims*

On October 25, the defendants filed two motions for summary judgment on Henrikson's remaining claims.[9] On November 4, Henrikson moved to continue the trial date for approximately three more months. Among other reasons, Henrikson stated that, because of the defendants' summary judgment motions, Henrikson's deposition schedule had been accelerated and the motions had disrupted Henrikson's review of discovery.

---

[9] The defendants noted two motions for summary judgment in August. Henrikson moved to strike notice of the motions, but the trial court denied Henrikson's request.

Through their summary judgment motions, the defendants argued that Henrikson's defamation claims against the County, Zorich, and Khandelwal and Henrikson's remaining claims for negligence, negligent misrepresentation, fraudulent misrepresentation, and statutory invasion of privacy should be dismissed.[10]

Relevant to this appeal, Henrikson had alleged in his negligence claim that the defendants owed him a duty "to protect [Henrikson's] independent and effective representation of King County clients from political influence." CP at 382. He also alleged that the County, as Henrikson's employer, owed him "a duty to provide a work environment that regulated obvious self-dealing." CP at 382. In moving for summary judgment, the defendants argued that none of the duties Henrikson's argued defendants had were cognizable under the law. In response, Henrikson argued that the defendants, "as attorney employers, owed Henrikson, an attorney employee, a duty to protect his independent and effective representation of King County clients from political influence." CP at 2390. He argued that such duty was recognized by logic, common sense, justice, policy, and precedent.

For Henrikson's statutory invasion of privacy claim, Henrikson alleged Zorich and the County violated his rights under Washington's privacy act because Zorich illegally "intercepted" communications sent to Henrikson from his clients, including the Client, and a communication sent to Henrikson by his doctor. CP at 378. Henrikson alleged that the violations caused him "mental pain and suffering, and other injury." CP at 379.

Zorich admitted that, when Henrikson was placed on administrative leave and the County disabled Henrikson's access to his work computer, she monitored Henrikson's work e-mail

---

[10] Henrikson had already voluntarily dismissed his breach of contract claim against the County.

"to avoid interruption in client communications." CP at 2076. She also admitted that, during this time, she noticed an audio file and transcription of a voicemail from Henrikson's doctor come through Henrikson's e-mail. Zorich forwarded the voicemail to Henrikson.

A County policy in effect at this time provided:

> Although [County employees] may be expected to maintain the privacy and confidentiality of information to which they have access, they are not guaranteed personal privacy for any activity in which they engage utilizing County computing resources. This includes legitimate county purposes, Minimal Personal Use, violations of acceptable use or any other use. This includes, but is not limited to, word processing documents, spreadsheets, databases, electronic and voice mail, and Internet access. [County employees] should be aware that all activity undertaken on any King County Information Assets, including legitimate county purposes, Minimal Personal Use, violations of acceptable use or any other purpose, is subject to monitoring, recording and intervention by Organization management for the purpose of System update, maintenance, security and compliance with countywide and Organization-specific policies and standards. Any use of King County Information Assets constitutes [County employees] consent to such monitoring, recording and intervention. [County employees] expecting privacy for their Minimal Personal Use should use a different means of communication.

CP at 2089. The policy provided that assets under the policy included "telephones, Mobile Devices, . . . and electronic communication services for the performance and fulfillment of job responsibilities" and that such assets were the "property of [the County] government." CP at 2085, 2089. Additionally, an agreement between DPD and Henrikson's union explicitly recognized that "all staff members are bound by the attorney-client privilege and by . . . ethical obligations." CP at 2509. The agreement also stated that the DPD and union created a "[v]ertical [r]epresentation" structure where generally a particular attorney would work on a case throughout its duration, but the case could be reassigned to another attorney for various reasons. CP at 2509.

Henrikson admitted he knew the County had a right to monitor his county activities, including a right to monitor his calls.[11]  Nevertheless, Henrikson asserted in an e-mail to Zorich "that is a completely separate issue from protecting the client's expectation of privacy upon which the entire reputation of DPD and the legal profession rest."  CP at 2145.

In a declaration, Henrikson stated that his mobile phone was set up to automatically transcribe voicemails left on the phone from speech to text and then send the voicemail message to Henrikson's county e-mail.  In another declaration, the Client stated that, while Henrikson was on administrative leave, they called and left messages for Henrikson on Henrikson's work phone.  Zorich discovered the Client's calls and messages and warned the Client that Henrikson's employment would be terminated if they called him again.

Zorich and the County argued that Henrikson's privacy claim failed as a matter of law because Henrikson lacked standing to assert claims on behalf of his clients and because Henrikson had no expectation of privacy for communications maintained on his County e-mail account.  Henrikson responded that he had standing because he suffered injuries recognized by the privacy act.  Henrikson also stated that the evidence supported both Henrikson and the Client having a reasonable expectation that communications from the Client would not be monitored by third parties without first obtaining the Client's informed consent.  Without the Client's consent, Henrikson argued that Zorich and the County breached Henrikson and the Client's right to privacy.

On November 22, the trial court granted defendants' motions for summary judgment and dismissed with prejudice all claims.  Regarding Henrikson's defamation claim, the court found that

---

[11] At the hearing on this summary judgment motion, Henrikson's attorney conceded that Henrikson "did understand that the county had a right to monitor personal calls and things like that."  RP (Nov. 22, 2024) at 20.

his challenges to certain statements were either time barred, Henrikson failed to show any genuine issue of material fact, or the statement was a privileged communication involving no undisclosed facts. The court found that, as a matter of law, no duty supported Henrikson's negligence and negligent misrepresentation claims. For Henrikson's fraudulent misrepresentation claim, the court found that, even assuming that false statements were made, Henrikson failed to show that he relied on any of the challenged statements and failed to show any clear, cogent, and convincing evidence of a resulting injury. Concerning the invasion of privacy claim, the court found that the client consented to the recording of their messages and Henrikson agreed that his accounts would be monitored. Finally, the court noted that the public duty doctrine provided immunity to Khandelwal for claims against her.

After granting the defendants' motions for summary judgment and dismissing the claims, the trial court denied Henrikson's motion to continue, finding the issue now moot.

D. *Motions for Reconsideration or Vacation of the Summary Judgment Orders*

In December, Henrikson moved for reconsideration and vacation of all the summary judgment orders. He argued that case scheduling and discovery issues—occurring after the trial court granted Henrikson's motion to continue on April 24, 2024—warranted reconsideration or vacation of all the summary judgment orders. He argued that relief from the orders was justified under CR 60(b).[12] The court denied Henrikson's motions, finding that Henrikson failed to meet

---

[12] CR 60(b) provides that a court may relieve a party from an order for various reasons including for "[m]istakes, inadvertence, surprise, excusable neglect or irregularity in obtaining a judgment or order[,] . . . [n]ewly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under rule 59(b), . . . misconduct of an adverse party[,] . . . [u]navoidable casualty or misfortune preventing the party from prosecuting or defending." CR 60(b)(1), (3)-(4), (9).

his burden to show he was entitled to reconsideration or vacation of the order because his arguments related to factual issues and the summary judgment decisions were "primarily" rulings based in law.  RP (Dec. 20, 2024) at 21.

E.      *Award of Statutory Damages*

Goldsmith requested an award of $10,000 in statutory damages pursuant to RCW 4.24.510, asserting that he had prevailed on Henrikson's defamation claim by raising an anti-SLAPP immunity defense.  Henrikson opposed Goldsmith's request, arguing that Goldsmith was not entitled to an award of damages under the anti-SLAPP statute because Goldsmith wrote his investigation report in bad faith.  Henrikson also stated:

> Defendants feigned confusion about the basis for Henrikson's defamation claim, then asserted the anti-SLAPP defense in their reply brief, after Henrikson did not have a fair chance to respond. These and other issues will be addressed on appeal.

CP at 3702.  The court granted Goldsmith's request, awarded Goldsmith $10,000 in statutory damages, and entered a final judgment ordering Henrikson to pay the award.

Henrikson appeals.

## ANALYSIS

### I. SUMMARY JUDGMENT

Henrikson claims that the trial court erred in granting summary judgment in the defendant's favor and dismissing three of his claims: Henrikson's wrongful termination in violation of public policy claim against the County, his invasion of privacy claim against Zorich and the County, and his negligence claim against the County.  We disagree.

---

Henrikson also argued for relief under CR 59, however, Henrikson makes no argument that he was entitled to relief from these orders under CR 59 in this appeal.  Accordingly, we do not consider whether any relief should have been granted under that rule.

A.       *Summary Judgment Standard*

We review grants of summary judgment de novo.  *Frausto v. Yakima HMA, LLC*, 188 Wn.2d 227, 231, 393 P.3d 776 (2017).

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Fite v. Mudd*, 19 Wn. App. 2d 917, 926, 498 P.3d 538 (2021); CR 56.  We view the facts and draw reasonable inferences in the light most favorable to the nonmoving party.  *Fite*, 19 Wn. App. 2d at 926.  A genuine issue of material fact exists where reasonable minds could disagree on the facts controlling the outcome of the case.  *Johnson v. Lake Cushman Maint. Co.*, 5 Wn. App. 2d 765, 778, 425 P.3d 560 (2018).

In summary judgment proceedings, the moving party bears the initial burden of showing that there is no genuine issue of material fact.  *Sartin v. Estate of McPike*, 15 Wn. App. 2d 163, 172, 475 P.3d 522 (2020).  The moving party can do so either "by setting out its own version of the facts *or* by alleging that the nonmoving party failed to present sufficient evidence to support its case."  *Galassi v. Lowe's Home Ctrs., LLC*, 4 Wn.3d 425, 444, 565 P.3d 116 (2025) (quoting *Pac. Nw. Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 350, 144 P.3d 276 (2006)).

If the moving party satisfies its initial burden, the burden then shifts to the nonmoving party to present specific facts demonstrating a genuine issue of material fact.  *Welch v. Brand Insulations, Inc.*, 27 Wn. App. 2d 110, 115, 531 P.3d 265 (2023).  If, at this point, the nonmoving party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' then the trial court should grant the motion."  *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

In such a situation, summary judgment is appropriate because "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 225 (quoting *Celotex*, 477 U.S. at 322).

B.      *Wrongful Termination in Violation of Public Policy Claim*

Henrikson argues that summary judgment for Henrikson's wrongful termination claim was improper because (1) Henrikson identified clear mandates of public policy that existed as a matter of law, (2) there were genuine issue of material facts as to whether Henrikson acted in furtherance of these clear mandates, and (3) the County did not have an overriding justification for terminating Henrikson.[13]  We disagree.

---

[13] Preliminarily, Henrikson argues that the County failed to meet its burden in summary judgment by not addressing all of Henrikson's public policy bases for his claim.  Specifically, Henrikson contends that the County failed to address Henrikson's allegation that he acted in furtherance of a public policy on the right to counsel, a right to access to the courts, an obligation to share work product with other attorneys, an obligation to refuse illegal orders, and an obligation to not have political interference with client representation.

However, in its motion for summary judgment, the County noted that Henrikson "points to various alleged policies found in the United States and Washington Constitutions, *including* the rights to due process and assistance of counsel."  CP at 545-46 (emphasis added).  The County went on to broadly argue that "none of these policies support Mr. Henrikson's claim that he was obligated to provide [the client] with representation in the separate *civil* litigation.  In fact, there is no legal authority to support Mr. Henrikson's argument that representing [the client] was necessitated by a clear mandate of public policy."  CP at 546.  While Henrikson disputed whether his actions in the civil defamation case amounted to "representation," the County clearly argued that summary judgment should be granted because Henrikson could not establish any clear mandate of public policy to support his claim.  *See* CP at 829 (Henrikson describing his conduct in the civil defamation case as "[a]ssisting with the [r]epresentation" of the client); *see also* Br. of Appellant at 45 (stating the County's arguments were based on a false premise that Henrikson represented the client).

1.      *Legal Principles*

Generally, under a common law principle known as the at will doctrine, "an employment contract, indefinite as to duration, is terminable at will by either the employee or employer." *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 223, 685 P.2d 1081 (1984). In 1984, joining a growing majority of jurisdictions, our supreme court recognized the tort for wrongful termination in violation of public policy as a narrow exception to the at will doctrine. *Id.* at 232.

Since then, Washington case law has adopted two frameworks for analyzing the tort: one applicable when the allegations fit within four scenarios in which the tort usually arises and another when the claim falls outside of those scenarios. *Suarez v. State*, 3 Wn.3d 404, 430, n.3, 552 P.3d 786 (2024). Here, the parties dispute which framework applies. Although both frameworks overlap in parts of their analysis, we take a moment to set out each and determine the applicable test provided the nature of Henrikson's claim.

The first framework applies if the plaintiff's claim "fits neatly within" one of four specific scenarios: if an employee is fired (1) for refusing to commit an illegal act, (2) for performing a public duty or obligation like jury duty, (3) for exercising a legal right or privilege like pursuing a workers' compensation claim, or (4) in retaliation for reporting employer misconduct. *Id.* at 430; *Martin v. Gonzaga Univ.*, 191 Wn.2d 712, 723, 425 P.3d 837 (2018). If the claim fits within one or more of these scenarios, a burden-shifting test applies. *See Suarez*, 3 Wn.3d at 430.

The employee has the burden of establishing a prima facie case. *Id*. To do so, the employee must demonstrate two things:

> First, the "public policy" was manifested in the constitution, statute, regulatory provision, or court decision. . . . Second, the conduct associated with the public policy was a "significant factor" in the decision to terminate the worker.

*Id.* (quoting *Martin*, 191 Wn.2d at 723) (citations omitted).  If the employee succeeds, the burden shifts to the employer to prove that it terminated the employee for reasons other than those alleged by the employee.  *Id.*; *see Martin*, 191 Wn.2d at 725-26 (the employer must "'articulate a legitimate nonpretextual nonretaliatory reason for the discharge.'") (quoting *Wilmot v. Kaiser Alum. & Chem. Corp.*, 118 Wn.2d 46, 70, 821 P.2d 18 (1991)).

If the plaintiff's claim does not fit within one of the four scenarios mentioned above, courts apply "a more refined analysis" guided by the "Perritt framework."  *Rose v. Anderson Hay & Grain Co.*, 184 Wn.2d 268, 277, 358 P.3d 1139 (2015); *see also Karstetter v. King County Corr. Guild*, 193 Wn.2d 672 n.7, 444 P.3d 1185 (2019).  The Perritt framework refers to a four-element test proposed by Henry H. Perritt Jr., a notable scholar of labor and employment law.  *See Gardner v. Loomis Armored Inc.*, 128 Wn.2d 931, 941, 913 P.2d 377 (1996) (citing Henry H. Perritt Jr., *Workplace Torts: Rights and Liabilities* § 3.7 (1991)).

Under this framework, the employee must prove (1) "the existence of a clear public policy" (the clarity element) (2) "that discouraging the conduct in which [the employee] engaged would jeopardize the public policy," (the jeopardy element) and (3) "that the public-policy-linked conduct caused the dismissal" (the causation element).  *Id.* (alterations added, emphasis omitted).  For the last element (the absence of justification element), the court weighs any justification for the dismissal against the public policy to determine whether the public policies outweigh the employer's concerns.  *Id.* at 941, 948-49.

2.      *There Was No Genuine Issue of Material Fact That Henrikson's Discharge Contravened or Jeopardized Any of Henrikson's Argued Public Policies*

Here, Henrikson's claims at issue on appeal do not neatly fit within any of the four specific scenarios discussed in *Suarez*. Thus, we scrutinize Henrikson's claim under the four-part Perritt framework.

Under the Perritt framework, we "first ask[] if any public policy exists whatsoever, and then ask[] whether, on the facts of each particular case, the employee's discharge contravenes or jeopardizes that public policy." *Gardner*, 128 Wn.2d at 941-42.

Determining what qualifies as a clear mandate of public policy is a question of law subject to de novo review. *Roe v. TeleTech Customer Care Mgmt. LLC*, 171 Wn.2d 736, 756, 257 P.3d 586 (2011). We look for a public policy that is "'an authoritative public declaration of the nature of the wrong.'" *Id.* at 757 (quoting *Roberts v. Dudley*, 140 Wn.2d 58, 63, 993 P.2d 901 (2000)). A clear mandate of public policy must "be clear and truly public; it does not exist merely because the plaintiff can point to legislation or judicial precedent that addresses the relevant issue." *Id*. A clear mandate of public policy may arise from "the letter or purpose of a constitutional, statutory, or regulatory provision or scheme" or prior judicial decisions. *Gardner*, 128 Wn.2d at 936. However, we may not "'sua sponte manufacture public policy.'" *Rickman v. Premera Blue Cross*, 184 Wn.2d 300, 310, 358 P.3d 1153 (2015) (quoting *Roberts*, 140 Wn.2d at 65).

Our supreme court has cautioned that "'*courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject*.'" *Roe*, 171 Wn.2d at 755 (quoting *Thompson*, 102 Wn.2d at 232). While *Gardner* "refined the tort's analytical framework somewhat [the supreme court] expressly refrained from substantively

changing the underlying tort requirements." *Rose*, 184 Wn.2d at 277. "[T]he public policy at issue [must] be judicially or legislatively recognized [because] the tort is a narrow exception to the at-will doctrine and must be limited only to instances involving very clear violations of public policy." *Id.* at 276.

Below, the County argued that Henrikson failed to present sufficient evidence to support his wrongful termination claim because he could not establish any clear public policy nor that the County lacked a legitimate, non-pretextual reason for terminating Henrikson's employment through the undisputed evidence. Thus, they met their initial burden and the burden shifted to Henrikson to present a genuine issue of material fact through at least "establish[ing] the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Young*, 112 Wn.2d at 225; *see Galassi*, 4 Wn.3d at 444.

Henrikson identifies five public policies he argues the County jeopardized or contravened by terminating his employment: (1) a right to counsel guaranteed under the Sixth Amendment; (2) a public policy in ensuring independent and effective assistance of counsel, free from a conflict of interest; (3) a right of access to the courts; (4) an attorney's duty to disobey unethical, unlawful, illegal, or other orders harmful to their clients; and (5) a public policy requiring counsel to obtain their client's informed consent before limiting their representation.

Assuming without deciding that these qualify as clear mandates of public policy for purposes of the tort (clarity element), we consider whether Henrikson established a genuine dispute of material fact regarding the tort's jeopardy element.

The jeopardy element exists to "guarantee[] an employer's personnel management decisions will not be challenged unless a public policy is genuinely threatened." *Gardner*, 128

25

Wn.2d at 941-42. Under this element, the public policies must be jeopardized by the employee's discharge. *Gardner*, 128 Wn.2d at 945. The employee must show that "they engaged in particular conduct and the conduct *directly relates* to the public policy or was *necessary* for the effective enforcement of the public policy." *Rose*, 184 Wn.2d at 277 (alteration in original).

This burden is observably a high one. The employee must "'argue that other means for promoting the policy . . . are inadequate.'" *Rose*, 184 Wn.2d at 277-78 (quoting *Gardner*, 128 Wn.2d at 945). "In other words, the plaintiff must argue that the actions he or she took were the *only* adequate means to promote the public policy." *Rose*, 184 Wn.2d at 278 (emphasis added). Moreover, the employee must show how the threat of dismissal will discourage others from engaging in the desirable conduct called for by the public policy. *See Gardner*, 128 Wn.2d at 945.

At most, here Henrikson argues that a genuine issue of material fact existed because his assistance of the Client in the civil case "furthered" the identified public policies, especially the Client's right to independent and effective counsel, right to work product and discovery, and right to access the courts.[14] Br. of Appellant 56. However, neither here nor below did Henrikson explain how other means for promoting his identified public policies were inadequate considering the circumstances. Significantly, the Client had an attorney representing them in the Civil Case after Henrikson was first directed to cease working on the case. Additionally, Henrikson does not

---

[14] To the extent that Henrikson argues that his employer violated a "First Amendment right to argue and disagree," we decline to consider this argument because Henrikson fails to provide any authority supporting the existence of such a right and Henrikson only raises this argument in passing. Br, of Appellant at 60; *see DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none."); *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.").

argue that the threat of dismissal would discourage others from protecting a client's right to counsel, ensuring unconflicted independent and effective assistance of counsel, protecting a client's right of access to the courts, disobeying unethical, illegal, or harmful order and obtaining their client's informed consent before limiting their representation. Considering Henrikson's conduct, Henrikson fails to show that his termination "genuinely threatened" his identified public policies.[15] *Gardner*, 128 Wn.2d at 941-42, 946 (armored truck driver leaving their truck to save a woman's life was necessary because the driver was the women's only source of help; no police or other people were available).

Because Henrikson failed to establish a genuine issue of material fact as to the jeopardy element or that the defendants were not entitled to judgment as a matter of law, we do not analyze any of the other Perritt test elements as all are required to support Henrikson's wrongful termination claim. *See Gardner*, 128 Wn.2d at 943. Accordingly, summary judgment was appropriate.

C.      *Invasion of Privacy Claim*

Henrikson argues that summary judgment for his claim that Zorich and the County violated RCW 9.73.030, Washington's privacy act, was also improper. We disagree.

Washington's privacy act, "one of the most restrictive electronic surveillance laws ever promulgated," "broadly protects individuals' privacy rights." *State v. Roden*, 179 Wn.2d 893, 898, 321 P.3d 1183 (2014) (citing to ch. 9.73 RCW). Under the act, it is illegal for "any individual,

---

[15] Notably, RCW 71.09.045 limits the scope of an attorney under contract with OPD providing indigent defense representation of a client in SVP proceedings, including, "unless provided as part of investigation and preparation for any hearing or trial under [chapter 71.09 RCW], . . . other activities as may be excluded by policy or contract with the office of public defense."

partnership, corporation, association, or the state of Washington, its agencies, and political subdivisions to intercept, or record" private communications without the consent of all participants in the communication or without a court order. RCW 9.73.030(1)(a), .040. The act provides exceptions for emergencies, threats, and the investigation of specific crimes, but none of those circumstances apply here. *See State v. Bilgi*, 19 Wn. App. 2d 845, 854, 496 P.3d 1230 (2021) (citing RCW 9.73.030(2), .210, .230).

Any person claiming that a violation of the privacy act has injured their business, person, or reputation may seek damages from the person who violated the act. RCW 9.73.060. Through the legal action, a plaintiff may recover actual damages "including mental pain and suffering endured by [them] on account of [the] violation," liquidated damages, and reasonable attorney fees and costs. RCW 9.73.060.

A violation of the privacy act occurs when there is "(1) a private communication transmitted by a device, which was (2) intercepted or recorded by use of (3) a device designed to record and/or transmit (4) without the consent of all parties to the private communication." *Roden*, 179 Wn.2d at 899. Henrikson does not argue that an unlawful recording occurred. Instead, Henrikson argues that a violation occurred by Zorich unlawfully intercepting communications sent to Henrikson from his clients, including the Client.

It is undisputed that, when Henrikson was placed on administrative leave and the County disabled Henrikson's access to his work computer, Zorich monitored Henrikson's work e-mail. Viewing the evidence in the light most favorable to Henrikson, during this time, the Client called and left voicemails for Henrikson on Henrikson's work phone. Zorich discovered the Client's calls and voicemails and warned the Client that Henrikson's employment would be terminated if

they called Henrikson again. It appears that Zorich was able to access the Client's call record and voicemails through monitoring Henrikson's e-mail as an audio file and transcription of voicemails on Henrikson's phone were being forwarded to his county e-mail.

Per county policy, any activity on certain County assets, including e-mails and voicemails, was subject to monitoring, recording and intervention by County management. By using these assets, County employees consented to the monitoring, recording, and intervention. Henrikson admitted he knew the County had a right to monitor his county activities. Nevertheless, Henrikson asserted to Zorich that the County's right to monitor his activities was "a completely separate issue from protecting the client's expectation of privacy." CP at 2145.

Henrikson argues that he and the Client had a reasonable expectation of privacy in the Client's calls and voicemails because of their attorney-client privilege and because the Client did not consent to their communications being monitored by other TDAD attorneys. Henrikson claims that, while the Client consented to the recording of their message by leaving a voicemail, the Client did not consent to Zorich accessing the voicemails because there is no evidence that the Client knew of the county policy. Zorich and the County argue that, because Henrikson consented to the County's monitoring of his e-mails and voicemail, no interception occurred. We agree with Zorich and the County.

When a person communicates to another through an electronic device that records messages, like leaving a voicemail, Washington courts deem them to have implicitly consented to the recording of that communication. *State v. Townsend*, 147 Wn.2d 666, 675-76, 57 P.3d 255 (2002) (email); *In re Marriage of Farr*, 87 Wn. App. 177, 184, 940 P.2d 679 (1997) (voicemail). Recently, our court considered whether part of that implied consent to the message's recording

includes an understanding that the recorded communication could be shared with others and concluded that it does. *Bilgi*, 19 Wn. App. 2d at 857-60.

In *Bilgi*, the appellant argued that law enforcement unlawfully intercepted text messages he sent to a device he thought was communicating with a 13-year-old boy but was actually communicating with a law enforcement officer. *Id.* at 848-49, 853. The law enforcement officer used software on her computer to receive and respond to Bilgi's text messages. *Id.* at 849-50. The software stored their conversation under a shared account that other law enforcement officers had access to and could read or participate in the conversation. *Id.* at 850-51. While the one law enforcement officer was the only one who responded to Bilgi's text messages using the software, other law enforcement officers read Bilgi's text messages through the software. *Id.*

In considering Bilgi's argument that an unlawful "interception" under the privacy act of his communications occurred, our court observed:

> When the sender of a written electronic message impliedly consents to the message's recording, they bear the risk that the intended recipient will share the message with others. In [*State v.*] *Glant*, we reasoned that when a person sends e-mail or text messages, "they do so with the understanding that the messages [will] be available to the receiving party for reading or printing." 13 W[n]. App. 2d [356,] 365, 465 P.3d 382 [2020]. In our view, it is logical to assume they do so with the additional understanding that the messages will be available to the receiving party for forwarding or sharing electronically.

*Id.* at 857 (some alterations added).

The court concluded that the other law enforcement officers who viewed Bilgi's text messages did not unlawfully intercept the communications. *Id.* at 859-60. In reasoning that no violation of the privacy act occurred, the court stated, "When an account is held by multiple people, the account holders do not violate the privacy act by simultaneously receiving messages sent to that account." *Id.* at 859. The court reasoned that Bilgi's intended recipient was the phone

number he sent the text messages to and the messages were received by that number. *Id*. The other officers did not "covertly receive" the messages, manipulate the software or the one officer's computer, or otherwise "open" the messages before they were received by the phone number. *Id*.

Here, the Client's intended recipient of their calls and voicemail was Henrikson's work phone number. Through a process that appears to have been set up before or as a result of Henrikson's leave, voicemails left on Henrikson's work phone were set up to be forwarded to Henrikson's work e-mail address. Henrikson does not argue nor did he provide any facts below indicating that the County did not own or did not have access to either Henrikson's work phone or his work e-mail address. Instead, Henrikson admitted that he knew the County had a right to monitor his use of county property, including phone calls.

From these facts, the circumstances here appear similar to those in *Bilgi* where the Client's communications reached their intended recipient, either Henrikson's work phone or work e-mail address. Like the appellant in *Bilgi*, by the Client leaving a record of their communication through a voicemail, the Client "bear[ed] the risk that the intended recipient [would] share the message with others." *Id.* at 857. For purposes of the privacy act, under these circumstances, it is irrelevant whether the Client knew Henrikson had already agreed to share or would decide to share the Client's communications which they implicitly consented to being recorded, particularly where others in the office were required to keep confidential information private. While Henrikson did not directly share the Client's message with Zorich, Henrikson knew both his work phone and work e-mail address were subject to monitoring by management. Through utilizing these devices to communicate with the Client, Henrikson consented to management's ability to monitor any recorded communications on those devices.

Under these circumstances, there was no genuine dispute of material fact that Zorich's access to the Client's voicemails through monitoring Henrikson's work e-mail constituted an unlawful interception. Accordingly, summary judgment on this claim was appropriate.

D. *Negligence Claim*

Henrikson claims that the trial court erred in dismissing his negligence claim. However, in arguing that an error occurred, Henrikson raises a new theory of liability that is distinct from what he argued below.

Before the trial court, Henrikson alleged that the County breached two duties: a duty "to protect [Henrikson's] independent and effective representation of King County clients from political influence" and another "to provide a work environment that regulated obvious self-dealing." CP at 382. Now, Henrikson abandons those previously asserted theories of liability and raises a theory of negligent supervision. Because Henrikson raises this argument for the first time on appeal, we decline to reach his argument. *See* RAP 2.5(a) ("The appellate court may refuse to review any claim of error which was not raised in the trial court."); *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 290, 850 P.2d 860 (1992) ("Arguments or theories not presented to the trial court will generally not be considered on appeal.").

## II. MOTIONS TO RECONSIDER OR VACATE

Henrikson argues that the trial court erred in denying his CR 60 motions for reconsideration or to vacate the trial court's dismissal of his claims through the three summary judgment proceedings. We disagree.

In December 2024, Henrikson moved for reconsideration or vacation under CR 60(b) of all summary judgment orders because of case scheduling and discovery issues, including alleged

discovery violations, that occurred after April 24, 2024.  The trial court found that Henrikson failed to meet his burden of showing he was entitled to relief under CR 60 because Henrikson's arguments only related to factual issues and the summary judgment decisions were "primarily" based in law.  RP (Dec. 20, 2024) at 20-21.

Whether to grant or deny a motion to vacate a judgment under CR 60(b) is within the trial court's discretion.  *Shandola v. Henry*, 198 Wn. App. 889, 896, 396 P.3d 395 (2017). Accordingly, we review CR 60(b) orders for abuse of discretion.  *Id.* at 896.  An abuse of discretion occurs if the trial court bases its decisions on untenable grounds or makes its decision for untenable reasons.  *Id.* at 896.

Henrikson fails to show that the trial court abused its discretion in denying the CR 60 motion.  Henrikson's only argument is that the reasoning of the trial court was error because the summary judgment orders were actually rulings of fact instead of law.  Here, not all of the summary judgment orders appear to have been ruling of law; however, the trial court appears to have recognized this by using the term "primarily" in its ruling.  RP (Dec. 20, 2024) at 21. Summary judgment dismissal of the majority of Henrikson's defamation claims, his negligence and negligent misrepresentation claim, his invasion of privacy claim, and all of his claims against Khandelwal appear to have been resolved on issues of law.  The remaining dismissed claims— wrongful termination in violation of public policy, some defamation claims, and Henrikson's fraudulent misrepresentation claim—arguably centered around whether Henrikson established a genuine issue of material fact.

However, even if the trial court erroneously considered these rulings to also be rulings of law, it was reasonable for the trial court to nevertheless deny Henrikson's motion for vacation or

reconsideration considering his arguments below. All of the case schedule and discovery issues Henrikson relied on in his CR 60 motion occurred after the trial court's summary judgment order dismissing Henrikson's wrongful termination claim. The trial court dismissed Henrikson's wrongful termination claim on April 12, 2024, and all the case schedule and discovery issues Henrikson argued months later in the December motion hearing allegedly occurred after April 24, 2024. Henrikson did not show how any of these later-occurring issues related to his ability to defend against the State's motion for summary judgment several months earlier.

For Henrikson's fraudulent misrepresentation and defamation claim, Henrikson provided no explanation how inadequate time or newly discovered evidence would have impacted summary judgment on those two claims. Considering these other grounds supporting denying Henrikson's motion, Henrikson's fails to show that reversal of the trial court's CR 60 orders is warranted. *See Ladenburg v. Campbell*, 56 Wn. App. 701, 703, 784 P.2d 1306 (1990) ("This court can affirm on any basis established by the pleadings and supported by the evidence, even if the trial court did not consider it.").

III. AWARD OF ANTI-SLAPP DAMAGES

Henrikson claims that the trial court erred by awarding Goldsmith anti-SLAPP damages under RCW 4.24.510.

Under RCW 4.24.510, "[a] person who communicates a complaint or information to any branch or agency of federal, state, or local government, . . . is immune from civil liability for claims based upon the communication to the agency or organization regarding any matter reasonably of concern to that agency or organization." If "[a] person prevail[s] upon the defense provided for in this section[, they] . . . shall receive statutory damages of ten thousand dollars."

But "[s]tatutory damages may be denied if the court finds that the complaint or information was communicated in bad faith." RCW 4.24.510.

Henrikson argues that the trial court erred in awarding Goldsmith these statutory damages because (1) Goldsmith did not raise an anti-SLAPP defense until his reply brief in the underlying defamation claim dismissal, (2) the trial court did not dismiss the defamation claim on anti-SLAPP grounds, and (3) Goldsmith was not entitled to anti-SLAPP protection for the communications at issue in Henrikson's defamation claim. However, all these arguments are raised for the first time on appeal. When Goldsmith moved to dismiss Henrikson's defamation claim, Henrikson argued that he sufficiently pleaded the claim, that he complied with statutory requirements for requesting retraction, and that Goldsmith did not qualify for immunity specific to public figures. And, when Goodsmith later moved for an award of damages pursuant to RCW 4.24.510, Henrikson only raised the statutory damages' exception for communications made in bad faith. As the arguments Henrikson makes here were not raised in the trial court, we decline to reach the issue under RAP 2.5(a).

## CONCLUSION

We hold that (1) Henrikson fails to establish a genuine issue of material fact necessary to his wrongful termination claim and invasion of privacy claim, (2) Henrikson's challenge to the dismissal of his negligence claim fails because he raises a different negligence claim for the first time on appeal, and (3) Henrikson fails to show that the trial court abused its discretion in denying his CR 60 motions. We decline to consider Henrikson's anti-SLAPP damages award arguments raised for the first time on appeal. Accordingly, we affirm.

No. 60334-9-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Maxa, J.

Veljacic, C.J.